Keasler, J., delivered the opinion of the Court as to Parts I, II, III-A, III-C, III-D, and IV, in which Hervey, Richardson, Yeary, and Keel, JJ., joined, and filed an opinion as to Part III-B, in which Hervey, Richardson, and Keel, JJ., joined.
Dai'Vonte Ross is accused of committing disorderly conduct for "intentionally or knowingly ... display[ing] a firearm ... in a public place in a manner calculated to alarm."[1] The information charging him with this offense largely tracks the relevant penal statute. Both the trial judge and the San Antonio Court of Appeals held that this information does not provide Ross with sufficient notice. Concluding that the information is completely descriptive of a criminal offense, we will reverse their decisions.
I. FACTS
This is a State's pre-trial appeal.[2] Ross presently stands charged by information with disorderly conduct under Texas Penal Code Section 42.01(a)(8), which says that a person commits an offense if he "intentionally or knowingly ... displays a firearm or other deadly weapon in a public place in a manner calculated to alarm."[3] The information charging Ross similarly alleges that, "on or about the 8th Day of June, 2016, Dai'vonte E'Shaun Titus Ross did intentionally and knowingly in a manner calculated to alarm, display a firearm in a public place, to wit: the 300 block of Ferris Avenue."
Ross moved to quash the information, "asserting [that] his constitutional right to be fairly informed of the charge was denied 'by the failure of the Information to allege ... the manner and means by which the offense was allegedly committed.' "[4] At the hearing on the motion, Ross argued that tracking the language of the statute provided insufficient notice with respect to this particular disorderly-conduct offense, specifically because Texas is an open-carry state.[5] He asserted that, to give sufficient notice, the information needed to contain additional facts specifying how the manner of display was "calculated to alarm"-so as to distinguish the charged conduct from the otherwise-lawful open display of a firearm. The State responded that such additional facts would be evidentiary in nature *820 and that the State was not required to plead evidentiary matters.[6] The trial judge granted the motion to quash, and the State appealed.
The court of appeals affirmed. Relying on our opinion in May v. State (addressing a vagueness challenge to the pre-1983 harassment statute),[7] the court of appeals concluded that the term "alarm," as it appears in Section 42.01(a)(8), is unconstitutionally vague-and is therefore necessarily "of indeterminate or variable meaning" when used without clarification in a charging instrument.[8] The court of appeals ultimately held that "when a defendant is charged with disorderly conduct under section 42.01(a)(8), he is entitled to notice of how the manner in which he displayed [the] firearm was calculated to 'alarm' because absent such notice the defendant would be unable to prepare a defense."[9]
II. LAW
"The sufficiency of a charging instrument presents a question of law. An appellate court therefore reviews a trial judge's ruling on a motion to quash ... de novo. "[10]
The Texas and United States Constitutions grant a criminal defendant the right to fair notice of the specific charged offense.[11] To provide this fair notice, the charging instrument must convey sufficient information to allow the accused to prepare a defense.[12] In most cases, a charging instrument that tracks the relevant statutory text will provide adequate notice to the accused.[13] But tracking the language of the statute may be insufficient if the statutory language is not "completely descriptive" of an offense.[14]
We have held, for example, that "if the prohibited conduct is statutorily defined to include more than one manner or means of commission," then "the State must, upon timely request, allege the particular manner or means it seeks to establish."[15] Because Section 42.01(a)(8) is not statutorily defined to include more than one manner or means of commission, that requirement is not implicated in this case. We have also said that "[a] statute which uses an undefined term of indeterminate or variable meaning requires more specific pleading in order to notify the defendant of the nature of the charges against him."[16] That requirement is at least potentially implicated here.
The court of appeals apparently sought to determine whether the term *821 "alarm" is indeterminate or variable by first considering whether the statute in which that word appears, Penal Code Section 42.01(a)(8), is unconstitutionally vague on its face. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[17]
The State makes a plausible argument that, in analyzing the statute's potential for vagueness, the court of appeals was attempting to resolve an issue not squarely before it. Whether a particular indictment or information satisfies the constitutional and statutory requisites of a charging instrument is a separate-and arguably much narrower-question compared to whether the statute underpinning the indictment is vague.
On the other hand, there is some sense to the court of appeals' approach. The court of appeals' reasoning seems to be that, because the term "alarm" as it appears in Penal Code Section 42.01(a)(8) is unconstitutionally vague, any indictment containing that term will, without further elaboration, necessarily provide inadequate notice to the defendant of the nature of the accusation against him. Although it may have implications for other disorderly-conduct prosecutions, there is nothing absurd about this way of thinking.
We will assume, without deciding, that the court of appeals properly reached the issue of whether Section 42.01(a)(8) is unconstitutionally vague in determining whether an information tracking that statute provided Ross with sufficient notice. Ultimately, however, we disagree with the court of appeals' resolution of that issue. We begin our analysis by examining the text of Section 42.01(a)(8), to determine the elements of this particular disorderly-conduct offense.[18]
III. ANALYSIS
A. What Section 42.01(a)(8) proscribes.
i. "Alarm."
Penal Code Section 42.01(a)(8) says that "[a] person commits an offense if he intentionally or knowingly ... displays a firearm or other deadly weapon in a public place in a manner calculated to alarm."[19] Most of Ross's complaint, and most of the court of appeals' analysis, turns on what Ross perceives to be the vagueness and/or indeterminacy of the word "alarm." Because "alarm" is undefined, we look to its common usage.[20]
A common dictionary defines the verb "alarm" as either (1) "to give warning to," (2) "to strike with fear," or (3) to "disturb, excite."[21] We agree with the State that, in the context of Section 42.01(a)(8), the latter two definitions are *822 the ones plainly embraced by the language of the statute.[22] We furthermore agree that construing "alarm" to mean "strik[ing] with fear," particularly in a sudden or exciting manner, makes that term both comprehensible to the ordinary person and evenhandedly enforceable.
But the court of appeals' concern over the meaning of "alarm" clearly did not arise from the lack of a suitable dictionary definition of that word. Instead, the court of appeals found the term "alarm" to be constitutionally fraught precisely because "conduct that alarms some people does not alarm others."[23] The court of appeals cited to a Fifth Circuit opinion, Kramer v. Price , which suggested that the bare term "alarm" is "inherent[ly] vague[ ]" for this very reason.[24] The court of appeals concluded that an ordinary person attempting to conform his conduct to the statute would have no idea how to do so, because he would have no way of knowing how, if at all, those who were present to witness his display would react to it.
But, as the State rightly points out, the literal language of the statute does not require the actor to avoid actually alarming another person. Instead, the statute proscribes displaying a firearm in a particular manner-one that is "calculated to alarm."
ii. "Calculated."
This raises yet another question: What does the word "calculated" mean? Our sister court, the Supreme Court of Texas, has held that the word "calculated" may, depending on the context, "mean either likely or intended."[25] And, again consulting with a common dictionary, we agree; in this context, "calculated" can be reasonably understood to mean either "planned or contrived to accomplish a purpose," or else simply "likely."[26]
Because the word "calculated" may be reasonably interpreted in either of two ways, our precedents indicate that it is ambiguous, permitting us to consult extra-textual interpretive sources to best discern its meaning.[27] And, for the following reasons, we conclude that, in Penal Code Section 42.01(a)(8), "calculated" is best understood to mean "likely," according to an objective standard of reasonableness and from the perspective of an ordinary, reasonable observer.
We begin by noting that, in a more exhaustive dictionary, it says that when "calculated" is used as a synonym for "likely," it is typically "used with a complementary infinitive."[28] An infinitive verb usually takes the form, "to [verb]." Some examples of infinitive verbs are "to walk," "to run," "to jump," and so forth. And that is the precise verb form that follows the *823 word "calculated" in Section 42.01(a)(8) -"to alarm."
We note also that this calculated-plus-infinitive-verb construction appears in several other Texas criminal statutes.[29] For example, Article 36.19 of the Code of Criminal Procedure states that jury-charge error is not reversible unless, among other things, the error appearing from the record was "calculated to injure" the rights of the defendant.[30] As the State concedes, "calculated" in this context is better understood to convey likelihood or probability rather than intent. We have never held that, to establish reversible jury-charge error under Article 36.19, the appellant must show that the trial court "purposely or intentionally injured his rights."[31] This tends to support the idea that, when the Legislature uses the word "calculated" with an infinitive verb, it generally, but perhaps not always, intends to convey likelihood rather than purposefulness.[32]
By comparison, there are several reasons why the intent-centric understanding of "calculated" is not as workable in the context of Section 42.01(a)(8). First of all, if "calculated" is understood to convey intent or purposefulness, it would essentially function as a kind of culpable mental state. We have often said that when the Legislature wishes to attach a particularized culpable mental state to an element of an offense, "it knows how to do so."[33] The disorderly conduct statute is no exception. For example, under Penal Code Section 42.01(a)(11), a person commits an offense if, "for a lewd or unlawful purpose," he enters on the property of another and looks into a dwelling.[34] Had the Legislature wished to convey some heightened sense of intent or purposefulness in Section 42.01(a)(8), we might have expected it to have used a similar construction as Subsection (a)(11). But it did not do so. This casts some doubt on the idea that the Legislature meant for the word "calculated" to serve as a culpable mental state in Section 42.01(a)(8).
Furthermore, construing "calculated" to refer to objective probability rather than subjective intent would put the statute on surer constitutional footing from a vagueness perspective. This is because, as the Supreme Court of Texas has noted, reading "calculated" to convey a sense of objective likelihood also tends to invoke the reasonable-person standard.[35] We agree with our sister court that the word "calculated," used in this manner, does convey some sense of the reasonable person's response, rather than the actor's subjective intent. And we note that linking this objective-likelihood understanding of "calculated" to the reasonable-person standard *824 greatly reduces Section 42.01(a)(8)'s susceptibility to a vagueness challenge-because compliance with the statute would not turn upon the unknowable, idiosyncratic sensibilities of whoever may be present.[36]
Simply attaching a culpable mental state to an undefined term does not, to the same extent as the reasonable-person standard, alleviate that term's potential for vagueness. In Kramer , the Fifth Circuit struck down the former harassment statute as unconstitutionally vague because "the standard of conduct it specifies is dependent on each complainant's sensitivity."[37] The State argued that any vagueness in the statute was cured by the inclusion of a culpable mental state. But the Fifth Circuit disagreed: "Specifying an intent element does not save [the statute] from vagueness because the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague."[38] The objective understanding of the word "calculated" avoids this concern by design.
Putting these ideas together, we conclude that the phrase "a manner calculated to alarm" means a manner that is objectively likely to frighten an ordinary, reasonable person.
iii. Culpable Mental State
Finally, there remains the question of "how far down the sentence" the culpable mental state of "intentionally or knowingly" travels.[39]
In McQueen v. State , we said that "where specific acts are criminalized because of their very nature, a culpable mental state must apply to committing the act itself."[40] Section 42.01(a)(8) quite plainly attaches a culpable mental state to "the act itself," which in this context is displaying a firearm. But, especially in an open-carry state like Texas, displaying a firearm in a public place is not criminalized because of its very nature. Under Section 42.01(a)(8), something beyond the bare act of displaying a firearm in public is required to make a complete criminal offense.
McQueen elaborated that "where otherwise innocent conduct becomes criminal because of the circumstances under which it is done, a culpable mental state is required as to those surrounding circumstances."[41] We believe that whether a particular manner of displaying a firearm is calculated to alarm is such a circumstance. A person might intentionally display a firearm in a public place and, without any guiltiness of mind, exhibit it in a manner that is objectively likely to frighten an ordinary person. If that display was truly unwitting with respect to its capacity to alarm, we believe this conduct could reasonably be described as "innocent." But if the display was made in a public place and with knowledge that it was objectively likely to frighten an ordinary person, it surely could not. That being the case, the culpable mental state of "intentionally or knowingly" [42]
*825 is best understood to embrace the element of "in a manner calculated to alarm."
We conclude that, to be guilty of disorderly conduct under Penal Code Section 42.01(a)(8), a person must intentionally and knowingly display a firearm in a public place in a manner that he knows is likely, under an objective standard of reasonableness, to frighten the average, ordinary person.
B. A conflict with open carry?
For the reasons that follow, we do not perceive any tension between our reading of Section 42.01(a)(8) and the right of law-abiding Texans to openly carry their firearms.
Penal Code Section 46.035 generally defines how a person may, if properly licensed, openly carry a handgun in a public place. Under Subsection (a), a person who is properly licensed under Subchapter H, Chapter 411 of the Government Code commits an offense if he carries a handgun on or about his person and "intentionally displays the handgun in plain view of another person in a public place."[43] It is an exception to the offense that the handgun was "carried in a shoulder or belt holster by the license holder."[44] The basic idea is that a civilian may openly carry a handgun in a public place only if (1) he is properly licensed to do so, and (2) the handgun is carried in a shoulder or belt holster.
Because keeping the handgun in a shoulder or belt holster is described as an exception to this offense, we can fairly deduce that all that is required for someone to "display" a handgun under Section 46.035 is for him to carry the handgun on or about his person in plain view of another. If a license holder carries a handgun in plain view of another by keeping it in a shoulder or belt holster, he is "display[ing]" the handgun, but his conduct does not violate Section 46.035 because it falls within the statutory exception. On the other hand, if a license holder openly carries a handgun in a public place in a leg or ankle holster, he is "display[ing]" the handgun, and he may not avail himself of the exception; barring some other defense or exception, this person's conduct violates Section 46.035. In any event, in both of these circumstances, the actor has "displayed" a handgun in contemplation of Penal Code Section 46.035.
But that is all he has done-"display[ed] a firearm."[45] By comparison, Section 42.01(a)(8) does not say that a person commits an offense if he merely "displays a firearm in a public place." By its terms, Penal Code Section 42.01(a)(8) requires an additional something else-it requires displaying plus "a manner calculated to alarm."[46]
It is therefore apparent from the language of the statute that a person does not commit disorderly conduct if all he is doing is lawfully exercising his open-carry rights. That is because, if the person is merely carrying his firearm on his person and in plain view of the public, then all he is doing in contemplation of Section 42.01(a)(8) is "display[ing]" the weapon, *826 and nothing more.[47] If he is displaying a handgun by carrying it in a holster that does not comply with Section 46.035, then he may still be guilty of an offense under that section, even though he has not violated Section 42.01(a)(8). But the fact that a person's conduct might violate one statute and not another does not necessarily mean that the two statutes conflict with one another.[48]
C. So understood, Section 42.01(a)(8) is not vague.
Construing the statute in this manner, we conclude that it is not unconstitutionally vague. In the first place, this construction enables an ordinary person to know with reasonable certainty how to conform his conduct to the law. If a person simply carries a firearm on his person in plain view of another in a public place, then without any more information, the actor cannot be said to have displayed the firearm "in a manner calculated to alarm."[49] But if the actor knows that a particular manner of displaying his firearm, beyond merely carrying it on his person, is objectively likely to alarm an ordinary, reasonable person, he may not intentionally or knowingly display his weapon in that manner. This construction avoids the vagueness problem alluded to in Kramer because it does not require the actor to gauge the varying sensibilities of all possible complainants. Under our construction, the actor need only gauge the sensibility of the ordinary, reasonable person.
Furthermore, we do not think that this construction leaves the statute open to "arbitrary and discriminatory enforcement."[50] Far from being "standardless,"[51] the statute as we interpret it adopts a decidedly unitary standard-that of the ordinary, reasonable person. To be sure, there may be cases in which a person's display of a firearm comes close to the line of being objectively "calculated to alarm," such that reasonable law-enforcement officers and prosecutors could disagree about whether that display actually crossed the line. But under our construction, simply persuading a jury that the actor's display was objectively alarming would not, by itself, be enough for a conviction. The State would also ultimately have to prove to the jury's satisfaction that the actor knew that his display was objectively likely to alarm. Necessarily, then, the jury will have an opportunity to impose its common sense on both of these elements-the objective impact of the actor's display and the actor's state of mind when he engaged in the display. This additional hurdle should help to prevent prosecutors and police from using the statute to "pursue their personal predilections."[52]
The court of appeals relied on May v. State to conclude that the word "alarm" is "inherently vague,"[53] but we think that its reliance on May was misplaced. In May , we analyzed whether the former Texas *827 harassment statute was unconstitutionally vague.[54] Under that statute, a person committed an offense if, inter alia , he intentionally communicated with another person so as to "intentionally, knowingly, or recklessly annoy[ ] or alarm[ ] the recipient."[55] To assess the potential vagueness of that statute, we looked to the Fifth Circuit's decision in Kramer v. Price , which also involved a vagueness challenge to the former harassment statute.[56] Kramer , in turn, cited the Supreme Court's decision in Coates v. City of Cincinnati for the proposition that "[c]onduct that annoys some people does not annoy others."[57] Based on this quoted language, Kramer reasoned that the terms "annoy" and "alarm" are "inherent[ly]" vague.[58]
To the extent that Kramer and May suggest that the word "alarm" is vague in all possible settings, we disagree. In the first place, in both cases, that suggestion is dictum . Kramer and May only considered whether the word "alarm" was vague in the context of the former harassment statute. Those cases did not consider whether, or decide that, "alarm" is vague in every statute in which it appears. As a result, any language declaring the word "alarm" to be inherently vague was broader than necessary to decide the particular issues before the Kramer and May courts.[59] We are not bound by any such conclusion.
In the second place, Coates itself strongly suggests an that otherwise-vague law, even one containing a constitutionally perilous word like "annoy," might be saved if the reviewing court can determine "whose sensitivity" the actor must pay attention to in complying with the law.[60] And that is exactly the situation we are faced with here. Even if the word "alarm" raises some prima facie vagueness concerns in the context of Section 42.01(a)(8), those concerns are greatly alleviated by the inclusion of an objective reasonable-person standard.[61] For these reasons, we conclude that the concerns expressed in Kramer and May about the vagueness of the former harassment statute do not apply to the disorderly conduct statute.
D. An indictment tracking Section 42.01(a)(8) provides sufficient notice.
Of course, the fact that an underlying statute is reasonably clear does not necessarily mean that a charging instrument tracking that statute will provide sufficient notice to the defense. However, having construed Section 42.01(a)(8) in the manner that we have, we believe that an *828 information tracking that statute is also sufficiently clear.
This information essentially informs Ross that, on or about a specific date, he is accused of intentionally and knowingly displaying a firearm in a public place in a manner that he knew was objectively likely to frighten an ordinary, reasonable person. In this sense, the information may be said to be completely descriptive of an offense. It states everything "which is necessary to be proved,"[62] and it does so "in ordinary and concise language in such a manner as to ... give the defendant notice of the particular offense with which he is charged[.]"[63] Relatedly, so understood, the information allows Ross to begin preparing a defense. Knowing the precise bad-act allegation he must contend with, and when and where the bad act is alleged to have occurred, Ross may begin to think productively about the kind of evidence he might want to marshal, as well as how he might best convince a jury that his display was done with an innocent mind, objectively non-frightening, or both.
Furthermore, under our construction of Section 42.01(a)(8), none of the terms appearing in the information is of indeterminate or variable meaning. First, the meaning of each term in the information may be determined according to how we have interpreted those words in the statute. Second, to the extent that the term "alarm" might be said to have a variable meaning depending on the sensitivities of each potential complainant,[64] that concern has been alleviated by measuring "alarm" against the ordinary-person standard. That standard does not vary according to who may have witnessed the display. So, in this setting, "alarm" is a fixed, not variable, term.
Each of the dissenting opinions today expresses some concern that we are unfairly reversing the trial judge on a legal basis that he could not reasonably have predicted.[65] We think that these concerns are overstated. At root, what we finally resolve today is the legal dispute between Ross and the State about the sufficiency of the State's information. Reversing the lower courts' judgments is a practical necessity in settling that dispute-nothing more and nothing less. Our reversal should not be seen as a mark of disapproval for failing to predict how we would ultimately resolve the statutory ambiguities that we identify for the first time today.
In our capacity as a discretionary review court, our primary concern should be "shepherd[ing] the jurisprudence"[66] -so that if, in some future case, a similar issue should arise, the litigants and trial judge will be in a better position to decide the matter correctly. Were we to simply note the existence of a statutory ambiguity and on that basis affirm the trial judge's granting of the motion to quash, we would allow that ambiguity to persist, leaving future litigants and trial judges in doubt about its true meaning. While it has been argued that the statutory ambiguities at issue in this case are curable by a more specific charging instrument,[67] we think that that approach would effectively permit the *829 State to decide the content of the statute on a case-by-case basis. That would only add to Ross's concern that the ordinary citizen would have no idea how to conform his conduct to the disorderly-conduct statute.
The dissenting opinions also suggest that resolving the statutory ambiguity subjects Ross to a kind of ex post facto unfairness, because he was initially charged with a facially ambiguous information and only now, several years later, do we decide its meaning.[68] But this is a pre-trial appeal. And in that unique posture, this opinion is better understood as forward-looking or prospective, not retrospective.[69] It provides Ross with a definitive interpretation of the statute that he may rely on going forward; it does not punish him, post-conviction, for failing to correctly guess what our interpretation of the statute might have been. We are confident that our decision to resolve these statutory ambiguities, rather than overlook them, will alleviate Ross's initial concerns and put him in a better position to prepare a defense in any future trial.
It is true that the information in this case does not contain a comprehensive and detailed description of Ross's display of the firearm. It does not, for example, describe the position, angle, and direction of the weapon, the placement of it in Ross's hands, the expression on Ross's face, the words he allegedly uttered, and so forth. But, with the wrongful act described with sufficient clarity to allow Ross to understand "what is meant,"[70] these particulars would ultimately serve as nothing more than an accounting of how the State intends to prove that Ross's display was "calculated to alarm." That is exactly what is meant by "evidentiary matters."[71] Ross will no doubt have other opportunities to preview the precise manner in which the State intends prove that his display was objectively alarming,[72] but he cannot expect to gather that kind of information from a charging instrument.
IV. CONCLUSION
We reverse the court of appeals' judgment. The State's sole point of error on appeal having been sustained, we remand the case to the trial court for further proceedings.
Yeary, J., filed a concurring opinion.
Yeary, J., filed a concurring opinion.
I join all of the Court's opinion today except for Part III-B. I am not inclined to agree with the construction of Section 46.035(a) of the Penal Code that is embodied within that portion of the opinion. See TEX. PENAL CODE § 46.035(a) ("A license holder commits an offense if the license holder carries a handgun ... and intentionally displays the handgun in plain view of another person in a public place."). We are not called upon to definitively interpret this provision in the instant case, and, in any event, I see no need to. I am nevertheless compelled to share an alternative construction of the statute that I am inclined to regard as more likely.
Part III-B of the Court's opinion contemplates that to carry a handgun in a shoulder or belt holster would constitute a "display" of the weapon, but one that is not actionable under Section 46.035(a) because *830 of the exception. See id. ("It is an exception to the application of this subsection that the handgun was partially or wholly visible but was carried in a shoulder or belt holster by the license holder."). This does not seem to me to be the only possible-and is probably not even the preferable-construction of the statute. In my view, there is a palpable difference between carrying a handgun in such a manner that it is partially or wholly visible, on the one hand, and "displaying" it, on the other.[1] The use of the word "display" suggests to me that the statute may more likely contemplate that simply carrying a handgun is never an offense under Subsection (a), while publicly "displaying" it is always an offense unless the exception applies.[2]
By this-what strikes me as the more likely-construction of Section 46.035, it seems to me that as long as a licensed holder keeps his handgun holstered, he may carry his handgun with impunity.[3] If he carries it in a shoulder or belt holster, he may even go so far as to "display" it-that is, draw attention to it in some overt way that makes the fact that he is carrying it conspicuous-so long as the manner by which he displays it does not include withdrawing it from the holster. That the exception does not also include, for example, a leg or ankle holster does not inexorably suggest to me that it is an offense for a license holder to carry his handgun in those holsters; it may instead only suggest that, because the exception does not apply, he may neither withdraw it from the leg or ankle holster (subject to the defense embodied by Section 46.035(h), of course), nor draw conspicuous attention to it in the same way (not including withdrawing it *831 from its holster) that he could permissibly "display" a handgun in a shoulder or belt holster. But, I repeat, if this is how the statute is construed, he may always carry it in any holster with complete impunity-so long as carry is all he does.[4]
In any event, by this understanding, too, there should be no conflict between Section 46.035 and Section 42.01(a)(8) of the Penal Code, such as Judge Slaughter envisions. TEX. PENAL CODE § 42.01(a)(8). There is nothing intrinsically alarming about carrying a handgun in plain view in public so long as it remains holstered,[5] and I do not think that prosecutors will rush to criminally charge license holders who keep their handguns in their holsters. Because I agree with the Court's construction of Section 42.01(a)(8) -the statute we are called upon to construe in this case-I fully join all other portions of its opinion.
Newell, J., filed a dissenting opinion.
Newell, J., filed a dissenting opinion.
I agree with the Court's statutory analysis. The Court is right that there is a lack of clarity in the statute. The Court is right that the way our Legislature used the phrase "calculated to alarm" in the statute suggests a definition of "likely" rather than a second culpable mental state of intentional. And the Court is right that the need for clarity in the statute doesn't necessarily translate into a reason to quash the indictment. Finally, the Court is right that we should ascribe an objective test to determine whether a particular manner of display was likely to cause "alarm." I simply part ways with the Court's determination that tracking the statutory language in this case is sufficiently descriptive of the offense.[1] If our Legislature insists that the State draw a molecular-level distinction between "displaying" and "carrying," then the State must provide some clarity when it charges someone with displaying a firearm in public in a manner calculated to alarm. The statute requires a particular type of display; but in this case, the charging instrument does not provide any indication as to the "manner" in which the firearm was displayed except that it occurred in a public place and it was likely to alarm.[2]
*832 In that sense, I agree with Judge Walker that we are losing sight of what the case is about. Focusing on how an exception to a completely different offense might affect this offense carries a great temptation to substitute our individual policy preferences for the Legislature's in the name of statutory interpretation. The focus should be on whether an ordinary defendant could look at this information and prepare his defense.[3]
Again, I agree with the Court's thorough statutory analysis. But given the broader definitions of "calculate" and "alarm" at play in the statute, I believe it points to the opposite conclusion than the one drawn by the Court. I'd require the State to allege some facts in the charging instrument about the manner in which the firearm was displayed. I'd leave the question of how this statute is supposed to exist alongside a different statutory offense for when that question is more properly before us.
With these thoughts, I respectfully dissent.
Walker, J., filed a dissenting opinion, in which Slaughter, J., joined.
Walker, J., filed a dissenting opinion, in which Slaughter, J., joined.
Appellee, Dai'Vonte E'Shaun Titus Ross, was charged with violating the disorderly conduct statute. The information alleged that he "did intentionally and knowingly in a manner calculated to alarm, display a firearm in a public place." Appellee moved to quash the information, the trial court granted the motion, and the court of appeals affirmed the trial court's ruling. The allegation that Appellee's display was "calculated to alarm" is subject to at least two reasonable interpretations. Today, the majority of the Court chooses one interpretation. Judge Slaughter's dissenting opinion argues that another interpretation is correct. Whichever interpretation is correct is an issue of first impression at this Court. Appellee could not have had adequate notice of what an allegation that he displayed a firearm in a manner "calculated to alarm" charges him with doing, when the Court's decision about what that language means comes years after Appellee was charged. I respectfully dissent.
I - Adequate Notice
Under the Texas and United States Constitutions, a criminal defendant has the right to fair notice of the specific charged offense. State v. Zuniga , 512 S.W.3d 902, 906 (Tex. Crim. App. 2017) ; State v. Barbernell , 257 S.W.3d 248, 250 (Tex. Crim. App. 2008). "The charging instrument must convey sufficient notice to allow the [accused] to prepare a defense." Zuniga , 512 S.W.3d at 906 (quoting Curry v. State , 30 S.W.3d 394, 398 (Tex. Crim. App. 2000) ). Toward that end, Chapter 21 of the Texas Code of Criminal Procedure governs charging instruments and provides legislative guidance concerning the requirements and adequacy of notice. Id.
With respect to informations, article 21.21 sets out what facts must be included in an information and states that an information is sufficient if the offense is set forth in plain and intelligible words. TEX. CODE CRIM. PROC. Ann. art. 21.21(7) ; Barbernell , 257 S.W.3d at 251. Additionally, an information must include everything that is necessary to be proved. Barbernell , 257 S.W.3d at 251 ; TEX. CODE CRIM. PROC. Ann. arts. 21.03, 21.23. An information is sufficient if it:
charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common *833 understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment ....
Barbernell , 257 S.W.3d at 251 ; TEX. CODE CRIM. PROC. Ann. arts. 21.11, 21.23.
In most cases, a charging instrument that tracks the statutory language for an offense is sufficient to provide a defendant with adequate notice. Zuniga , 512 S.W.3d at 907. When a statutory term or element is defined by statute, the charging instrument does not need to allege the definition of the term or element. Id. Typically the definitions of terms and elements are regarded as evidentiary matters. Id.
In some cases, a charging instrument that tracks the statutory language may be insufficient to provide a defendant with adequate notice. Id. This is so when the statutory language fails to be completely descriptive. Id. Statutory language is not completely descriptive when the statute defines a term in such a way as to create several means of committing an offense, and the definition specifically concerns an act or omission on the part of the defendant. Barbernell , 257 S.W.3d at 251 (quoting Solis v. State , 787 S.W.2d 388, 390 (Tex. Crim. App. 1990) ).
Thus, when a statute defines the manner or means of commission in several alternative ways, a charging instrument will fail for lack of specificity if it neglects to identify which of the statutory means it addresses. Zuniga , 512 S.W.3d at 907. In such cases, more particularity is required to provide adequate notice. Id. Similarly, where a statute uses an undefined term of indeterminate or variable meaning, a charging instrument tracking such statutory language will require more specific pleading in order to notify the defendant of the nature of the charges against him. Id.
For example, in Olurebi v. State , the defendant was charged with credit card abuse, and the indictment tracked the language of the statute and alleged use of a fictitious credit card. Olurebi v. State , 870 S.W.2d 58, 59 (Tex. Crim. App. 1994). Although "credit card" was defined by statute, "fictitious" was not. Id. at 60-61. We determined that "fictitious credit card" was subject to two different meanings: either a credit card not issued by the purported owner or a credit card with an actual owner but issued to a nonexistent cardholder. Id. at 61. Because "fictitious credit card" was not defined by the legislature, and because there were two ways for a credit card to be "fictitious" under the statute, we held that "a trial court should grant a motion to quash an indictment that fails to adequately notify the defendant of the manner in which the credit card is fictitious." Id. at 62.
II - "Calculated" Provides Inadequate Notice
In this case, Appellee was charged by information of violating subsection (a)(8) of the disorderly conduct statute, which provides:
(a) A person commits an offense if he intentionally or knowingly:
(8) displays a firearm or other deadly weapon in a public place in a manner calculated to alarm;
TEX. PENAL CODE Ann. § 42.01(a)(8). The information tracked the language of the statute, alleging that:
on or about the 8th Day of June, 2016, DAI'VONTE E'SHAUN TITUS ROSS did intentionally and knowingly IN A MANNER CALCULATED TO ALARM, DISPLAY A FIREARM IN A *834 PUBLIC PLACE, to wit: the 300 block of Ferris Avenue
Information - Clerk's Original, Clerk's R. 7. The issue is whether this language tracking the statute provided Appellee with adequate notice of what he is alleged to have done.
The majority, in considering the meaning of "calculated," identifies two possible interpretations. "Calculated" could mean that a defendant would be guilty of an offense if he displays a firearm in a public place in a manner that he knows is likely to cause alarm, or it could mean that a defendant would be guilty of an offense if he displays a firearm in a public place in a manner that is planned or contrived to accomplish the purpose of causing alarm.
Because it could be interpreted in two different ways, the majority of the Court decides that "calculated" does not have a plain meaning and is ambiguous, and the majority proceeds to consult extra-textual interpretive sources to discern its meaning. See Arteaga v. State , 521 S.W.3d 329, 334 (Tex. Crim. App. 2017) ("A statute is ambiguous when it is reasonably susceptible to more than one interpretation."). After consulting dictionaries, other statutes, and a decision from our sister court, the majority ultimately chooses the "likelihood" interpretation of "calculated." Judge Slaughter's dissent also consults extra-textual sources, including the recently enacted "open-carry law," articles, and dictionaries to support a forceful and convincing argument that "calculated" should be interpreted under the "deliberately planned or contrived" meaning. I agree with Judge Slaughter's interpretation, but this is beside the point. The issue is whether Appellee had adequate notice of the offense charged based on a charging instrument that tracked this statutory language, which is subject to multiple, reasonable interpretations, as proved by the very disagreement between the majority and Judge Slaughter as to what it means.
Yet, despite the determination that "calculated" is subject to multiple interpretations, does not have a plain meaning, is ambiguous, and requires resort to extra-textual sources, the Court concludes Appellee had adequate notice of what he was accused of doing when he allegedly displayed a firearm in a manner "calculated" to alarm. Given the multiple interpretations of what "calculated" means and thus the language's ambiguity, Appellee could not have had adequate notice of the offense charged when it is alleged using those very same ambiguous words.
How could Appellee know, from a charging instrument alleging he displayed a firearm in a manner "calculated" to alarm, that he needed to tailor his defense against a prosecution that the manner of display was likely to cause alarm? The Court's construction of the language in this particular way is a new decision. Until today, an allegation that he displayed a firearm in a manner "calculated" to alarm could describe an offense where he displayed the firearm in a manner likely to cause alarm or an offense where he displayed the firearm in a manner deliberately planned or contrived to cause alarm. Appellee did not have the benefit of the Court's decision, handed down today, when the information charging him with the offense was filed two-and-a-half years ago. At that time, Appellee could have reasonably understood the charge to allege conduct under the second interpretation, that he displayed a firearm in a manner that was deliberately planned or contrived to cause alarm. Appellee would have been reasonable in believing that, to defend against such a charge, he would have to craft a defensive strategy of showing that his display was neither deliberately planned nor contrived to cause alarm, even though the evidence *835 may show that he knew that the manner of display was likely to cause alarm.
III - "Alarm" Provides Inadequate Notice
Furthermore, not only is "calculated" subject to multiple, reasonable interpretations, "alarm" is as well. The court of appeals appropriately determined that "alarm" was vague, because "conduct that alarms some people does not alarm others." State v. Ross , 531 S.W.3d 878, 883 (Tex. App.-San Antonio 2017, pet. granted). The court of appeals reached this decision by consulting our decision in May , in which we held that "alarm" in the pre-1983 version of the harassment statute was vague. May v. State , 765 S.W.2d 438, 440 (Tex. Crim. App. 1989).
Although the holding in May was superseded by statute and the infirmity of "alarm," as used in the harassment statute, was corrected,[1] the reasoning of May is still instructive, and the court of appeals correctly followed our lead. In May we relied upon the Fifth Circuit's decision in Kramer v. Price , in which that court earlier held that "alarm" in the pre-1983 version of the harassment statute was inherently vague. Id. ; Kramer v. Price , 712 F.2d 174, 178 (5th Cir. 1983). Kramer relied upon a United States Supreme Court decision which found that "annoy" was vague because "[c]onduct that annoys some people does not annoy others." Kramer , 712 F.2d at 177-78 ; Coates v. City of Cincinnati , 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). I agree with the court of appeals and Appellee that "alarm" is vague because it is undefined and conduct that alarms some people may not alarm others.
The Court's majority today acknowledges that "alarm" is undefined, and it identifies three possible meanings for "alarm" from the 1980 edition of Webster's New Collegiate Dictionary: "(1) 'to give warning to,' (2) 'to strike with fear,' or (3) to 'disturb, excite.' " Majority Opinion at 821-22 (quoting Alarm , WEBSTER'S NEW COLLEGIATE DICTIONARY (1980)). Just as "calculated" is an undefined term of variable meaning, so is "alarm," and more specific pleading was required to give Appellee adequate notice of how his displaying a firearm was supposed to have been calculated to "alarm." Zuniga , 512 S.W.3d at 907.
Ultimately, the Court decides that "alarm" means to "strike with fear," particularly in a sudden or exciting manner. This construction is preferable, says the majority, because it makes "alarm" "both comprehensible to the ordinary person and evenhandedly enforceable." Whether or not that interpretation is correct, and whether or not the consequences of the majority's interpretation bears the fruit the majority claims it will,[2] the Court's *836 reasoning highlights the problem we are actually faced with today. According to the majority, without the Court's "preferable" construction under the "strike with fear" meaning, a charge that a defendant displayed a firearm in a manner calculated to "alarm" would be incomprehensible to the ordinary person and would not be evenhandedly enforceable.
This was the exact position Appellee was in when he was supposed to have adequate notice of the charges against him. While the majority's determination of what "alarm" means out of multiple definitions may provide adequate notice to defendants going forward, Appellee was charged two-and-a-half years before the majority's decision of which definition of "alarm" was the intended definition. Up until today, "alarm" in the disorderly conduct statute was not defined. At the time Appellee was charged, the information's allegation that his display of a firearm was calculated to "alarm" did not give him notice that he had to defend against a charge that his display was calculated to "strike fear" into others. The language may have instead put him on notice that he was being charged with displaying a firearm in a manner calculated to give warning to others of approaching danger, and, construing the charge against him in this way, Appellee could have believed his defense against the charge should be to argue that the statute was overbroad and criminalized good behavior, because such charged behavior was actually salutary, beneficial to society, and should not be criminal altogether.
IV - Conclusion
From the Court's determination of what "calculated to alarm" means and that Appellee had adequate notice of what "calculated to alarm" means, the Court apparently deems that Appellee must have had the foresight, two-and-a-half years ago, to reach the same interpretation of both "calculated" and "alarm" that the majority reaches today. Should every defendant be deemed to have the clairvoyance to see what our future decisions will say about charging instruments that track statutory language that we acknowledge is subject to different interpretations and is ambiguous?
At the time Appellee was charged, "calculated to alarm" was an undefined term of variable meaning, and it required more specific pleading. Zuniga , 512 S.W.3d at 907. As Judge Slaughter's dissenting opinion states, the "Court's opinion ... acknowledges that the terms 'calculated' and 'alarm' in the disorderly-conduct statute are ambiguous in that they have more than one possible meaning. Finding that there are ambiguous statutory terms that heretofore this Court has not clarified, this should have ended the Court's inquiry and should have resulted in affirming the court of appeals." Dissenting Opinion at 839 (Slaughter, J., dissenting). I agree, and we should resolve this case in the same manner that we resolved numerous analogous cases dating back to 1942 and earlier,[3] and *837 as recently as 1994. In Olurebi , after we determined that the language of the indictment was ambiguous, we held that the trial court should have granted the motion to quash, and, because Olurebi's motion to quash was erroneously denied, we remanded to the court of appeals to determine whether the error impacted Olurebi's ability to prepare a defense. Olurebi , 870 S.W.2d at 62. Notably, we did not proceed to construe the meaning of the ambiguous terms. Unlike State v. Jarreau , in which we found Olurebi inapplicable because Jarreau "[did] not involve a statutorily-undefined term or a statute that is not completely descriptive of the offense," the case before us does involve a statutorily-undefined term. State v. Jarreau , 512 S.W.3d 352, 355 (Tex. Crim. App. 2017) ; see also State v. Mays , 967 S.W.2d 404, 407 (Tex. Crim. App. 1998) (concluding that we were not faced with the Olurebi problem because the portion of the statute in question contained only one manner or means of commission, and the statute defined that manner or means). Olurebi is applicable. The language of the indictment, as acknowledged by the Court, is ambiguous, and we should hold that trial court did what it should have when it granted the motion to quash. We should not proceed to construe the meaning of the ambiguous terms.[4]
Instead, the Court's inquiry does precisely that. "This ... misses the mark, as we are not concerned with the definition" of calculated and alarm "but rather, with the sufficiency of an information using the general term[s]" calculated and alarm. Haecker v. State , 571 S.W.2d 920, 921 (Tex. Crim. App. [Panel Op.] 1978). The issue before us asks: "Does such an information adequately notify the accused of the crime charged?" Id. As we said in Conklin v. State :
It would serve no useful purpose to here attempt to set forth the various definitions or meanings that could or might be given to the word ... It is sufficient to say that it has no fixed, definite, or certain meaning or application ... Such being true, the conclusion is reached that the indictment was subject to the criticism leveled, and that the motion to quash should have been sustained.
Conklin v. State , 144 Tex.Crim. 343, 162 S.W.2d 973, 975 (1942) (holding that indictment for keeping and exhibiting a "device" for the purpose of gaming, using statutory term of "device," was insufficient where "device" was undefined).
Even if the Court's decision today establishes "calculated to alarm" as a judicially defined term and it chooses one meaning from a number of variable meanings, that was not the case at the time the trial court decided Appellee's motion to quash. When the Legislature does not define a term, like the term in this case, and we recognize that there are multiple ways to interpret the term, the "trial court should grant a *838 motion to quash an [information] that fails to adequately notify the defendant of the manner in which the" display of a firearm was calculated to alarm. Olurebi , 870 S.W.2d at 62. Under the circumstances, the trial court did what it was required to do.
Appellee did not have adequate notice of what "calculated to alarm" was supposed to mean when the Court's decision today comes two-and-a-half years after he was charged. How was he to have notice that he was being charged with allegedly displaying a firearm in a manner likely to strike fear, when yesterday one could read the information as alleging he displayed a firearm in a number of different ways? The manner could have been, but was not necessarily limited to being: (1) deliberately planned or contrived to strike fear, (2) likely to disturb or excite, (3) deliberately planned or contrived to disturb or excite, (4) likely to give warning to others of approaching danger, or (5) deliberately planned or contrived to give warning to others of approaching danger. The trial court was not wrong in granting Appellee's motion to quash. I respectfully dissent.
Slaughter, J., filed a dissenting opinion.
Slaughter, J., filed a dissenting opinion.
I agree with the position taken by Judge Walker in his dissenting opinion, and I join him. The limited question in this case is whether the trial judge erred by granting Appellee's motion to quash, which resulted in dismissal of the information charging Appellee with disorderly conduct due to lack of adequate notice. As correctly identified by the trial court, the court of appeals, and Judge Walker, the disorderly-conduct statute contains ambiguous terms that, when viewed collectively, are so lacking in clarity that an information tracking those terms fails to provide adequate notice to the accused. Those ambiguous terms, as they pertain to the disorderly-conduct statute, have never before today been clarified by this Court. Thus, at the time Appellee was charged with disorderly conduct, he did not have the benefit of a clarification from this Court of the ambiguous terms,[1] and the State needed to plead the information with more specificity to ensure that he had adequate notice to prepare a defense. State v. Mays , 967 S.W.2d 404, 407 (Tex. Crim. App. 1998) ("A statute which uses an undefined term of indeterminate or variable meaning requires more specific pleading in order to notify the defendant of the nature of the charges against him.").[2] Because the State's information merely tracked the statutory language and that language was not "completely descriptive" of the offense, see id. , the information did not provide adequate notice of the manner and means by which Appellee allegedly committed disorderly conduct. Accordingly, on that basis, I would affirm the court of appeals and uphold the trial court's ruling on the motion to quash.
*839 Below, I address my disagreement with the Court's analysis on two grounds. First, I disagree with the scope of this Court's analysis, which examines each ambiguous statutory term and arrives at a definitive conclusion as to the meaning of those terms. That analysis goes beyond what is necessary to resolve the issue in this case, which asks us to decide only whether the trial judge's ruling dismissing the information was erroneous at the time it was made. Second, with respect to the Court's interpretation of the disorderly-conduct statute, I disagree with that interpretation because it fails to fully resolve an apparent conflict between the disorderly-conduct statute and Texas's recently enacted open-carry law. I address each of these points in turn below.
I. Once the Court found that the information tracking the statutory language was unclear due to the ambiguous statutory terms, the Court should have ended the inquiry and affirmed the lower courts.
The Court's opinion, which reverses the court of appeals and trial court, acknowledges that the terms "calculated" and "alarm" in the disorderly-conduct statute are ambiguous in that they have more than one possible meaning. Finding that there are ambiguous statutory terms that heretofore this Court has not clarified, this should have ended the Court's inquiry and should have resulted in affirming the court of appeals. The Court goes too far in conducting a full analysis of two ambiguous statutory terms, reaching a definitive conclusion on their meaning, and assigning a reasonable-person standard to the statute.
The court of appeals' analysis was limited to holding that the information here tracking the statutory language provided inadequate notice due to the inherent vagueness in the term "alarm." Ross v. State , 531 S.W.3d 878, 883 (Tex. App.-San Antonio 2017). The only issues presented to this Court on discretionary review are whether: (1) an information that tracks the language of section 42.01(a)(8) provides a defendant with sufficient notice that he displayed a firearm in a manner calculated to alarm; (2) the court of appeals erred by applying a First Amendment and Fourteenth Amendment rule to a Sixth Amendment complaint; and (3) the term "alarm" within the context of section 42.01(a)(8) is inherently vague. Ultimately, these three issues all pertain to whether the information charging Appellee with disorderly conduct provided him with sufficient notice of the nature of the charges against him.
In conducting our analysis of this issue, once we determined that there are ambiguous statutory terms that have never before been defined by this Court and that the charging instrument merely tracking the statutory language was not completely descriptive of the offense, we should have ended our inquiry there and held that there was insufficient notice. It is improper in this case with these limited issues for the Court to go beyond a finding of ambiguity to then, for the first time, define the ambiguous statutory terms and hold that, under these newly clarified statutory terms, Appellee was provided with sufficient notice. The Court's opinion correctly quotes State v. Zuniga , 512 S.W.3d 902, 907 (Tex. Crim. App. 2017), for the proper and limited analysis the Court should have conducted in this case:
[O]ur notice jurisprudence requires appellate courts to engage in a two-step analysis when analyzing whether a charging instrument provides adequate notice. First, the reviewing court must identify the elements of the offense. Next, it must consider whether the statutory language is sufficiently descriptive of the charged offense.
*840 Maj. Op. at 821, n. 18. The Court further acknowledges in its opinion that when conducting step two of this analysis, if the statute "uses an undefined term of indeterminate or variable meaning," then the charging instrument "requires more specific pleading in order to notify the defendant of the nature of the charges against him." Id. at 820 (quoting Mays , 967 S.W.2d at 407 ). While the Court quotes from Zuniga and Mays , it fails to limit its inquiry and analysis as directed in those two cases. Instead, the Court goes beyond a finding of ambiguity to analyze and define those ambiguous statutory terms. Then, after defining these statutory terms for the first time as they pertain to the disorderly-conduct statute, the Court holds that pursuant to the definitions determined by the Court today , the Appellee and the trial court should have understood those ambiguous terms in the same way in 2016 when the trial court granted the motion to quash. I disagree with the Court's decision to go beyond the scope of the grounds for review and the matters actually decided by the court of appeals to resolve this case. And I further disagree with the Court's decision to reverse the lower courts' judgment here based on a retrospective analysis of the statutory language that is immaterial to the notice issue in this case.
II. The Court's analysis fails to resolve the conflict between the disorderly-conduct statute and the open-carry law.
Not only do I disagree with the Court's scope of inquiry, I also disagree with its interpretation of the disorderly-conduct statute. Specifically, I disagree with the Court's definition of "calculated" as meaning "likely." Relatedly, I also disagree with the Court's assignment of the "reasonable person" standard as to whether an actor, under the disorderly-conduct statute, intentionally or knowingly displayed a gun in a manner "calculated to alarm." Although the majority opinion concludes that its interpretation of the disorderly-conduct statute resolves any possible conflict with the open-carry statute, in reality, the Court's interpretation potentially encompasses many instances of lawful open carry and thus does little to alleviate concerns regarding a conflict between the two statutes. Because of the possible implications raised by the Court's analysis, even though I believe the Court's analysis goes far beyond the scope of proper inquiry, I feel compelled to address the matters with which I disagree.
Since 2016, Texas's open-carry law has allowed properly-licensed handgun owners to openly carry their firearms in public in a shoulder or belt holster.[3] While Texas is *841 known for its many gun enthusiasts, it is common knowledge that many ordinary people, even in Texas, may become alarmed at the sight of a gun in public, regardless of the legal right to openly carry a firearm.[4] This fear at the mere sight of a gun is generally caused by a person's unfamiliarity with guns and the media's extensive coverage of gun violence and gun-control issues. Even if one believes these attitudes towards guns are unfounded, they nevertheless represent the sensibilities of a great number of ordinary Texans. The lawmakers who enacted open carry, being aware of these issues, apparently determined that the risk of public fear was outweighed by the probable benefit of crime deterrence through the presence of law-abiding armed citizens.[5] Given that it is common knowledge that many people fear guns and are alarmed by the mere sight of a gun, most gun owners are also subjectively aware that many people may become alarmed when they see a gun carried openly in public-holstered or not. This fear in seeing the gun may be temporary, but the disorderly-conduct statute does not place a temporal limit on the "alarm."
Despite acknowledging that the word "calculated" in the disorderly-conduct statute has more than one possible definition, the Court's opinion holds that this word means "likely" in this context. It also holds that the word "alarm" has multiple definitions but in this statute means "to strike with fear" or "frighten." The Court also assigns a reasonable-person standard to the determination of whether an actor's conduct in displaying his firearm is alarming. The statute as written provides that "a person commits an offense if he intentionally or knowingly ... displays a firearm or *842 other deadly weapon in a public place in a manner calculated to alarm." TEX. PENAL CODE § 42.01(a)(8). Using the Court's definitions and reasonable-person standard, the statute has the following meaning: "a person commits an offense if he intentionally or knowingly ... displays a firearm or other deadly weapon in a public place in a manner 'likely' to 'strike with fear' or 'frighten' a reasonable person." The Court reasons that "linking this objective-likelihood understanding of 'calculated' to the reasonable-person standard greatly reduces [the disorderly-conduct statute's] susceptibility to a vagueness challenge-because compliance with the statute would not turn upon the unknowable, idiosyncratic sensibilities of whoever may be present." Maj. Op. at 823-24. But the Court's interpretation of "calculated" and "alarm" joined with the reasonable-person standard in the disorderly-conduct statute have the opposite effect of what the Court intended.
As discussed more fully below, using "likely" as the definition of "calculated" may have the undesirable result of encompassing within the disorderly-conduct statute many instances of lawfully openly carrying a licensed firearm in public. Assigning the reasonable-person standard to the statute also encompasses lawful open-carry conduct, and ignores the statutory language, which is more properly understood as focusing on the subjective belief of the actor. It additionally creates the problem of encouraging arbitrary and discriminatory enforcement.
A. "Calculated" should be interpreted to mean "deliberately planned" based on the actor's subjective intent rather than "likely" as viewed from the perspective of a reasonable person.
As the Court's opinion acknowledges, there is more than one reasonable way of interpreting this statute. The word "calculated" may mean "likely," as this Court's majority concludes. But "deliberate," "intended," "planned or contrived to accomplish a purpose," and "carefully planned for a particular and often improper purpose" are also reasonable alternative definitions for "calculated."[6] Because "calculated" has multiple meanings that can impact how the statute is applied, the statute contains an ambiguity. When the statutory language is ambiguous, we may consider extra-textual sources to ascertain the collective intent of the Legislature. Arteaga v. State , 521 S.W.3d 329, 334 (Tex. Crim. App. 2017) ; Chase v. State , 448 S.W.3d 6, 11 (Tex. Crim. App. 2014). One such factor is the consequences of a particular construction. Arteaga , 521 S.W.3d at 334 ; see also TEX. GOV'T CODE § 311.023(5).[7]
*843 Here, the proof required to establish the offense of disorderly conduct varies significantly depending on the manner in which the word "calculated" is understood. If it means "likely," and using the Court's definition of "alarm" and the reasonable-person standard, then the statute merely requires proof that the defendant intentionally or knowingly displayed a firearm in a public place in a manner that he knew was likely to frighten an ordinary person. Using the reasonable-person standard shifts the inquiry from whether the actor subjectively believed his actions would alarm the target audience to whether a reasonable person would be stricken with fear as a result of the actor's display of a firearm. Thus, displaying a gun in a manner "likely" to alarm necessitates a determination of whether a reasonable person would be alarmed in that situation. A judge or jury could easily find that a reasonable person would be alarmed by seeing a gun openly displayed in public in a holster on someone's hip. Thus, there is a good possibility that a person who is lawfully openly carrying a weapon could be convicted of disorderly conduct for "display[ing] a firearm ... in a public place in a manner [likely] to [frighten]" a reasonable, ordinary citizen-even if he did not subjectively intend to alarm anyone and believed his conduct to be fully compliant with open-carry requirements.
Given the fact that properly-licensed Texans may lawfully openly carry a firearm in a hip or shoulder holster and this activity may frequently alarm a reasonable person, using "likely" as the definition for "calculated" in the disorderly-conduct statute also presents a possible vagueness issue because the statute then fails to identify any dividing line between lawful conduct and unlawful conduct. See Kramer v. Price , 712 F.2d 174, 176 (5th Cir. 1983) (finding that a statute is vague if it "fails to draw reasonably clear lines between lawful and unlawful conduct," "fail[s] to provide citizens with fair notice or warning of statutory prohibitions so that they may act in a lawful manner," or encourages "arbitrary and discriminatory enforcement"). Our Texas License-To-Carry holders deserve clarity to know that they may openly carry in a holster without fear of being arrested for disorderly conduct.
Thus, to uphold legislative intent and avoid a collision course between the disorderly-conduct statute and Texas's open-carry law, I would hold that "calculated" as used in the disorderly-conduct statute means "deliberately planned" or "planned or contrived to accomplish a purpose." Moreover, I would hold that the reasonable-person standard does not apply. Instead, I would assign the actor's subjective intent to determine whether by the display of a firearm the actor intended to alarm a target audience. The State would have to *844 prove, and a judge or jury would have to find, that the actor who was lawfully openly carrying a gun in a hip or shoulder holster did so with a deliberate plan to alarm a target audience. This definition drastically decreases the likelihood that a person lawfully openly carrying a weapon could be convicted of disorderly conduct.[8] This interpretation also renders the statute less susceptible to a vagueness challenge, for it would condition criminal liability on the actor's subjective intent to cause alarm through his conduct.[9]
B. The Court's opinion fails to garner a majority vote that would protect legal open carry.
The Court's opinion in Section III-B seems to create a rule that openly carrying a weapon, without more, can never satisfy the elements of disorderly conduct. But that section of the Court's opinion is merely a plurality with only four judges joining that section. While I support creating a bright-line rule that lawful open carry can never amount to disorderly conduct, with only a plurality vote, that section of the Court's opinion has no precedential value. Law enforcement, prosecutors, and courts can feel free to ignore that section. They can proceed with charging, trying, and convicting individuals for disorderly conduct who are lawfully openly carrying a holstered gun if they believe that the actor did so in a manner "likely" to frighten a reasonable person. Thus, an actor lawfully openly carrying a holstered weapon walking down the street next to an anti-gun violence rally could be arrested, charged, and convicted of disorderly conduct because he knew that it was likely that the reasonable people around him would be frightened at the sight of his gun. The portion of the Court's opinion that garners a majority vote does not help to resolve this issue. The Court's opinion thus leaves open the strong possibility that those engaged in lawful open carry will be subject to prosecution under the disorderly-conduct statute.
*845 III. Conclusion
Choosing between these two possible interpretations of the disorderly-conduct statute implicates significant constitutional and policy considerations. Under the Court's interpretation, as explained above, the statute conflicts with open-carry rights and poses a potential vagueness problem because it fails to draw a reasonably definite line between the lawful conduct of openly carrying a firearm in public and the unlawful conduct of displaying a firearm in a manner that the actor knows is likely to cause alarm. As a result of this holding, licensed handgun owners may avoid exercising their rights to open carry for fear that they will be prosecuted for doing so in a manner that they know may cause alarm to ordinary bystanders, even if they lacked any intent to do so. But under the interpretation I propose, the statute more readily passes constitutional muster because it conditions criminal liability on proof of the actor's subjective intent to cause public alarm through his conduct. Under my interpretation, there would be no conflict between the disorderly-conduct statute and the open-carry law. Defendants would be fairly placed on notice that they may not exercise their rights to open carry while doing so in a manner that they have subjectively calculated or planned to cause public fear or alarm. Because I view my proposed interpretation as being required to avoid a conflict with the open-carry law, and because this Court is obligated, whenever possible, to construe statutes in a manner that avoids grave constitutional concerns, I would hold that this construction of the statute is the proper one.
For the foregoing reasons, to the extent that the issue is properly before the Court, I would hold that the disorderly-conduct statute requires proof of more than a defendant's mere awareness that the manner in which he displays a firearm in public is likely to alarm an ordinary person. Rather, I would hold that the statute requires proof that a defendant carried his firearm in a manner that he has deliberately planned ("calculated") to cause alarm to bystanders. In any event, because neither Appellee nor the trial-court judge who dismissed the information in this case had the benefit of any statutory interpretation by this Court with respect to the proper meaning of the ambiguous terms in the disorderly-conduct statute, I would uphold the ruling dismissing the information due to lack of adequate notice. I, therefore, join Judge Walker and respectfully dissent from the Court's judgment reversing the dismissal of the information.
Keller, P.J., dissented.

Tex. Penal Code § 42.01(a)(8).

See Tex. Code Crim. Proc. art. 44.01(a)(1).

Tex. Penal Code § 42.01(a)(8).

See State v. Ross , 531 S.W.3d 878, 880 (Tex. App.-San Antonio 2017).

See Tex. Gov't Code ch. 411, subch. H ("License to Carry a Handgun").

See, e.g. , Curry v. State , 30 S.W.3d 394, 398 (Tex. Crim. App. 2000) ("On the other hand, the State need not plead evidentiary matters.") (footnote and citation omitted).

765 S.W.2d 438 (Tex. Crim. App. 1989).

See State v. Mays , 967 S.W.2d 404, 407 (Tex. Crim. App. 1998) ("A statute which uses an undefined term of indeterminate or variable meaning requires more specific pleading in order to notify the defendant of the nature of the charges against him.").

Ross , 531 S.W.3d at 884.

Smith v. State , 309 S.W.3d 10, 13-14 (Tex. Crim. App. 2010) (footnotes and citations omitted).

State v. Barbernell , 257 S.W.3d 248, 250 (Tex. Crim. App. 2008) (citations omitted); see also U.S. Const. amend. VI ; Tex. Const. art. I, § 10.

Barbernell , 257 S.W.3d at 250 (quoting Curry , 30 S.W.3d at 398 ).

Id. at 251 (citations omitted).

Curry , 30 S.W.3d at 398 (citing Olurebi v. State , 870 S.W.2d 58, 62 (1994) ).

E.g. , Saathoff v. State , 891 S.W.2d 264, 266 (Tex. Crim. App. 1994).

Mays , 967 S.W.2d at 407.

Kolender v. Lawson , 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citations omitted).

E.g. , State v. Zuniga , 512 S.W.3d 902, 907 (Tex. Crim. App. 2017) ("[O]ur notice jurisprudence requires appellate courts to engage in a two-step analysis when analyzing whether a charging instrument provides adequate notice. First, the reviewing court must identify the elements of the offense. Next, it must consider whether the statutory language is sufficiently descriptive of the charged offense.") (citations omitted).

Tex. Penal Code § 42.01(a)(8).

See, e.g. , Kirsch v. State , 357 S.W.3d 645, 650 (Tex. Crim. App. 2012) (citing Tex. Gov't Code § 311.011 ).

Alarm , Webster's New Collegiate Dictionary (1980).

See, e.g. , Wagner v. State , 539 S.W.3d 298, 306 (Tex. Crim. App. 2018).

Ross , 531 S.W.3d at 883 (quoting Coates v. City of Cincinnati , 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ) (brackets omitted).

Kramer v. Price , 712 F.2d 174, 177-78 (5th Cir. 1983) ; see also May , 765 S.W.2d at 440.

See Comm'n for Lawyer Discipline v. Benton , 980 S.W.2d 425, 438 (Tex. 1998) (citing, inter alia , Pouchan v. Godeau , 167 Cal. 692, 140 P. 952, 953 (Cal. 1914) ).

Calculated , Webster's New Collegiate Dictionary (1980) (some capitalization altered); see also calculated , Black's Law Dictionary (10th ed. 2014) (defining "calculated" as, inter alia , "[p]lanned so as to achieve a specific purpose; deliberate" or "[l]ikely; apt").

See, e.g. , Arteaga v. State , 521 S.W.3d 329, 334 (Tex. Crim. App. 2017).

Calculated , Webster's New International Dictionary (3d ed. 2002).

See, e.g. , Tex. Code Crim. Proc. arts. 36.14 ("calculated to arouse"), 36.19 ("calculated to injure"), 38.05 ("calculated to convey").

See ids="6178884" index="79" url="https://cite.case.law/us/415/566/#p575">id. art. 36.19.

State's Reply Brief at 8.

Cf. also Tex. Code Crim. Proc. art. 38.05 (a trial judge "shall [not], at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case"); English v. State , 85 Tex. Crim. 450, 457, 213 S.W. 632 (Tex. Crim. App. 1919) (op. on reh'g) ("[T]he question whether the judgment is to be reversed is determined, not upon the language used in making the comment, or the fact that the comment is made, but upon the consequences which probably result therefrom.") (discussing C.C.P. art. 787 (1911), precursor to current Tex. Code Crim. Proc. art. 38.05 ).

See Rodriguez v. State , 538 S.W.3d 623, 629 (Tex. Crim. App. 2018) (citations omitted).

See Tex. Penal Code § 42.01(a)(11).

Benton , 980 S.W.2d at 438-39.

See, e.g. , Munn v. City of Ocean Springs, Miss. , 763 F.3d 437, 440-41 (5th Cir. 2014) (vagueness arising from an otherwise "unquantifiable standard" is "constitutionally remedied ... by the inclusion of the reasonable person standard").

Kramer , 712 F.2d at 178 (referencing Coates , 402 U.S. at 613-14, 91 S.Ct. 1686 ).

Id.

See, e.g. , Liparota v. United States , 471 U.S. 419, 424 n.7, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

McQueen v. State , 781 S.W.2d 600, 603 (Tex. Crim. App. 1989).

Id.

But see Lugo-Lugo v. State , 650 S.W.2d 72, 87 (Tex. Crim. App. 1983) (Clinton, J., concurring) (observing that a person cannot "intend 'circumstances surrounding his conduct;' at most he may be 'aware of' (know) the existence of such circumstances").

Tex. Penal Code § 46.035(a).

Id.

Compare Tex. Penal Code § 42.01(a)(8) ("displays a firearm"), with Tex. Penal Code § 46.035(a) ("displays the handgun").

See Tex. Penal Code § 42.01(a)(8).

See id.

Cf. Lomax v. State , 233 S.W.3d 302, 312 (Tex. Crim. App. 2007) ("That [two statutes] might, in some situations, apply to the same conduct does not mean that they irreconcilably conflict.").

Tex. Penal Code § 42.01(a)(8).

See Kolender , 461 U.S. at 357, 103 S.Ct. 1855 (citations omitted).

See ids="11298570" index="100" url="https://cite.case.law/us/461/352/#p357">id. at 358, 103 S.Ct. 1855 (quoting Smith v. Goguen , 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) ).

See ids="6178884" index="105" url="https://cite.case.law/us/415/566/#p575">id. (quoting Smith , 415 U.S. at 575, 94 S.Ct. 1242 ).

Ross , 531 S.W.3d at 883 (citing May v. State , 765 S.W.2d 438, 440 (Tex. Crim. App. 1989) ).

See May , 765 S.W.2d at 438-40.

See ids="9966420" index="111" url="https://cite.case.law/sw2d/765/438/#p440">id. at 439 (quoting former Tex. Penal Code § 42.07(a)(1) ).

See id. at 440 (quoting Kramer v. Price , 712 F.2d 174, 178 (5th Cir. 1983) ).

See Kramer , 712 F.2d at 177 (quoting Coates v. City of Cincinnati , 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ).

Id. at 178 ("The Texas courts have made no attempt to construe the terms 'annoy' and 'alarm' in a manner which lessens their inherent vagueness.").

See Oliva v. State , 548 S.W.3d 518, 524 (Tex. Crim. App. 2018) ("[L]anguage in an opinion can be dictum if it is broader than necessary to resolve the case.").

See Coates , 402 U.S. at 613-14, 91 S.Ct. 1686 (deciding that the statute under review was unconstitutionally vague because, inter alia , "the [state] court did not indicate upon whose sensitivity a violation does depend-the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of the hypothetical reasonable man.").

See Munn , 763 F.3d at 442 ("Coates was not so much about the word annoys but about the impermissibility of a subjective standard.").

See Tex. Code Crim. Proc. art. 21.03.

See ids="6178884" index="122" url="https://cite.case.law/us/415/566/#p575">id. art. 21.11.

Cf. Kramer , 712 F.2d at 178.

See Dissenting Opinion at 836-37 (Walker, J., dissenting); Dissenting Opinion at 839-40 (Slaughter, J., dissenting).

See, e.g. , Morris v. State , 361 S.W.3d 649, 676 (Tex. Crim. App. 2011) (Price, J., dissenting).

See Dissenting Opinion at 838-39 (Slaughter, J., dissenting).

See, e.g. , Dissenting Opinion at 832-33 (Walker, J., dissenting); Dissenting Opinion at 840 (Slaughter, J., dissenting).

Contra Dissenting Opinion at 840 (Slaughter, J., dissenting).

See Tex. Code Crim. Proc. art. 21.11.

See Curry , 30 S.W.3d at 398.

See, e.g. , Tex. Code Crim. Proc. art. 39.14.

When it was originally enacted in 1995, Section 46.035(a) made it an offense for a license holder to carry a handgun and "intentionally fail to conceal" the handgun. Acts 1995, 74th Leg., ch. 229, § 4, p. 2013, eff. Sept. 1, 1995. It was amended in 2013, however, to add the current language, making it an offense to carry a handgun and "intentionally display[ ] the handgun in plain view of another person in a public place." Acts 2013, 83rd Leg., ch. 72, § 1, p. 140, eff. Sept. 1, 2013. This change of language-eliminating "fail to conceal" and replacing it with the term "display"-suggests to me that the word "display" should not be understood to mean merely carrying the handgun in a manner that might make it visible to another person. If that is what the Legislature hoped to accomplish, it could have just left the statute alone.

We have said that "we presume that every word in a statute has been used for a purpose and that each word, clause, and sentence should be given effect if reasonably possible." Ex parte Perry , 483 S.W.3d 884, 902 (Tex. Crim. App. 2016). If the meaning of "displays," as used in Section 46.035(a) is understood so broadly as to apply whenever a person merely "carries a handgun" "in plain view of another person," then the words "and ... displays the handgun" would be entirely stricken of any meaning. The Legislature easily could have written this law to establish an offense:
if the license holder carries a handgun on or about the license holder's person ... intentionally ... in plain view of another person in a public place.
Instead, the Legislature established that an offense would only be committed:
if the license holder carries a handgun on or about the license holder's person ... and intentionally displays the handgun in plain view of another person in a public place.
Tex. Penal Code § 46.035(a) (emphasis added). We give independent significance to the word "display" in the statute when we interpret it according to its common connotation of conspicuousness or ostentation. See Webster's Third New International Dictionary of the English Language , at 654 (2002) ("2 ...b : to exhibit conspicuously"); Webster's Ii New College Dictionary , at 328 ("3. To exhibit ostentatiously).

Subject, of course, to other provisions within Section 46.035, such as subsection (d), which prohibits any carrying of a handgun while intoxicated. Tex. Penal Code § 46.035(d).

And again, so long as he does not carry it in one of those places or circumstances prohibited by other portions of Section 46.035, such as a prison or an amusement park, or while intoxicated. Tex. Penal Code § 46.035(b) & (d), respectively.

Judge Slaughter asserts that it is "common knowledge" that "the sight of a gun in public" is alarming to "many ordinary people." Dissenting Opinion at 841. For that proposition, she cites what amounts to the naked opinions of a law professor and two note-writers. Id. n.4. She cites no empirical data or report of an empirical study to that effect, however, and neither do her sources.
My own intuition tells me that alarm at the sight of a citizen merely carrying a holstered handgun is quite irrational, especially here in the Lone Star State, at least in the absence of any circumstance to suggest that the citizen is doing so in violation of lawful regulations. It should be no more alarming than the sight of a 3000 pound automobile proceeding down a city street at the lawful speed limit and otherwise in compliance with the rules of the road. Both carry the potential for injury, but alarm is unwarranted without some other reason beyond the lawfully sanctioned conduct involved.

See State v. Mays , 967 S.W.2d 404, 406 (Tex. Crim. App. 1998) (noting that a charging instrument provides sufficient notice if it tracks the statutory language and the statute itself is completely descriptive of the offense).

Tex. Penal Code § 42.01(a)(8) ; see also Mays , 967 S.W.2d at 407 ("A statute which uses an undefined term of indeterminate or variable meaning requires more specific pleading in order to notify the defendant of the nature of the charges against him.").

State v. Barbernell , 257 S.W.3d 248, 251 (Tex. Crim. App. 2008).

After we decided May , the Legislature amended the statute to spell out what "alarm" means. Act of May 26, 1983, 68th Leg., R.S., ch. 411, § 1, 1983 Tex. Gen. Laws 2204, 2204 (amending Tex. Penal Code § 42.07(a) ); Bader v. State , 773 S.W.2d 769, 770 (Tex. App.-Corpus Christi 1989, pet. ref'd) ("It is apparent that the legislature, in amending section 42.07, corrected the defects of the former statute. The new law clearly delineates 'what alarms people.' ").
This was the appropriate result instead of the Court defining "alarm." See Long v. State , 931 S.W.2d 285, 297 (Tex. Crim. App. 1996) ("Any such changes [to clarify unconstitutionally vague statutory language] are the province of the legislature.").

I doubt that the "strike with fear" meaning of "alarm" is any more comprehensible or capable of evenhanded enforcement than any other meaning of "alarm," because it still suffers from the same defect that afflicted "alarm" in the pre-1983 harassment statute or "annoy" in Coates : even if it means "strike with fear," what strikes fear into some people does not strike fear into others. Judge Slaughter's dissenting opinion recognizes the reality that, even in Texas, "many ordinary people ... may become alarmed at the sight of a gun in public." Dissenting Opinion at 841 (Slaughter, J., dissenting). Without reasonably clear guidelines as to whose sensibilities must be offended, officials will be given unbounded discretion to apply the law selectively. Kramer , 712 F.2d at 178. Exactly who must be struck with fear: the judge or jury, the arresting officer, or a hypothetical reasonable man? Coates , 402 U.S. at 613, 91 S.Ct. 1686.

See, e.g. , Conklin v. State , 144 Tex.Crim. 343, 162 S.W.2d 973 (1942) ("device"); Monroe v. State , 143 Tex.Crim. 120, 157 S.W.2d 648 (1942) ("by means of threats, force, and fraud"); Parker v. State , 134 Tex.Crim. 138, 114 S.W.2d 906 (1938) ("tapping"); Beles v. State , 108 Tex.Crim. 214, 299 S.W. 899 (1927) ("becomes agent to obtain a poll tax"); Stanford v. State , 99 Tex.Crim. 111, 268 S.W. 161 (1925) ("post"); Kennedy v. State , 86 Tex.Crim. 450, 216 S.W. 1086 (1919) ("procure"); Thompson v. State , 16 Tex. Ct. App. 159 (1884) ("disturbing" a congregation); Lagrone v. State , 12 Tex. Ct. App. 426 (1882) ("impute a want of chastity"); Gray v. State , 7 Tex. Ct. App. 10 (1879) ("concerned in the purchase and sale of an interest in the public lands of the state of Texas"). In these cases, other than Conklin , in which we declined to even consider what the term meant, although we noted several meanings that could apply to the challenged statutory terms, we did not proceed to decide, definitively, which particular meaning would apply to those terms.

See Castillo v. State , 689 S.W.2d 443, 448-49 (Tex. Crim. App. 1984) (after determining that indictment for arson using statutory term "start a fire" was insufficient because "start a fire" was undefined, we did not proceed to define "start a fire").

As noted by Judge Walker, the Court fails to resolve the question of whether the trial judge's ruling was erroneous based on the law as it existed at the time of the ruling. Because the trial judge back then did not have the benefit of today's analysis, he was left with a statute containing ambiguous terms and an information that merely tracked the statutory language. Therefore, like Judge Walker, I disagree with the Court's decision to apply a post-hoc analysis of the ambiguous statutory terms in reversing the trial court and court of appeals.

See also Daniels v. State, 754 S.W.2d 214, 217 (Tex. Crim. App. 1988) (motion to quash is properly granted "where the language in the charging instrument concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed").

Act of May 29, 2015, 84th Leg., R.S., ch. 437, § 1, 2015 Tex. Gen. Laws 1706 (effective January 1, 2016). Additionally, Texas has long permitted a person to carry a long gun in public without any license.
In 2015, just before the enactment of the open-carry law, Texas prohibited the intentional display of a handgun in public even for concealed handgun license holders. Under Section 46.035 of the Texas Penal Code, in effect in 2015,
A license holder commits an offense if the license holder carries a handgun on or about the license holder's person ... and intentionally displays the handgun in plain view of another person in a public place.
Tex. Penal Code Ann . § 46.035(a) (West Supp. 2015). As part of the open-carry law, Section 46.035 was amended to create an exception for properly holstered handguns. Thus, the statute now provides,
A license holder commits an offense if the license holder carries a handgun on or about the license holder's person ... and intentionally displays the handgun in plain view of another person in a public place. It is an exception to the application of this subsection that the handgun was partially or wholly visible but was carried in a shoulder or belt holster by the license holder.
Tex. Penal Code Ann. § 46.035(a) (West 2018) (emphasis added).
Had Appellee committed the alleged offense in 2015 instead of 2016, there would be no issue and no conflict interpreting the disorderly-conduct statute in the manner which the Court's opinion provides. It would be an offense for anyone to intentionally or knowingly display a firearm in public in a way that was likely to cause alarm. But after the enactment of the open-carry law, interpreting the word "calculated" to mean "likely" creates an absurd result by posing a direct conflict with the open-carry law, which plainly permits the open display of firearms, even if doing so is likely to cause alarm to some bystanders.

See, e.g., Jonathan Meltzer, Note, Open Carry for All: Heller and Our Nineteenth-Century Second Amendment , 123 Yale L. J. 1486, 1522 (2014) ("There is little doubt that brandishing a weapon in most situations causes great alarm to the surrounding population."); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda , 56 UCLA L. Rev . 1443, 1521 (2009) ("In many places, carrying openly is likely to frighten many people[.]"); Reid Golden, Note, Loaded Questions: A Suggested Constitutional Framework for the Right to Keep and Bear Arms, 96 Minn. L. Rev . 2182, 2210 (2012) (open-carry scheme "may cause alarm in public"). I would also cite to the numerous media articles on the subject, but I believe any reader of this opinion is all too aware of such alarmist and ubiquitous coverage.

The legislative history reflects that supporters of the open-carry bill conceded the existence of "safety concerns" harbored by some, but supporters suggested that such concerns were unfounded and were outweighed by the potential positive effects of open carry-namely, a reduction in criminal activity due to the deterrent effect of law-abiding civilians visibly carrying handguns. See House Research Organization, Bill Analysis, C.S.H.B. 910, 84th Leg., R.S. (2015). Meanwhile, opponents of the legislation voiced the precise concern at issue in this case-that is, that "openly carrying handguns could create an environment of fear, intimidation, and unnecessary provocation." Id. at 7. Although the Texas Legislature apparently weighed these competing interests and determined that the risk of public alarm was outweighed by the other considerations favoring open carry, the Legislature's decision to legalize open carry should not be interpreted as broadly indicating that Texas citizens are not alarmed at the sight of firearms in public.

At the time of the disorderly-conduct statute's enactment in 1973, lawmakers would have probably understood the word "calculated" to mean "carefully thought out or planned," or "planned or contrived to accomplish a purpose; brought about by deliberate intent; likely." Random House Dictionary of the English Language Unabridged 209 (1967); Webster's New Collegiate Dictionary 117-18 (7th ed. 1971). The current version of Webster's New International Dictionary provides the following relevant definitions for "calculated": "planned or contrived so as to accomplish a purpose or achieve an effect: thought out in advance: deliberately planned"; "brought about or brought into existence as a consequence of deliberate intent and planning"; or "likely-used with complementary infinitive." Webster's New International Dictionary 315 (3d. ed. 2002).

Although the legislative history is another extra-textual factor we may consider, it is largely unhelpful in resolving this particular issue. The law governing disorderly conduct has been in existence in Texas in one form or another for well over 100 years. Prior to the reformation and adoption of the 1974 Penal Code, the offense was known as "Disturbance of the Peace." See 1911 Tex. Penal Code , art. 470. Under the 1911 Penal Code, the law provided, in relevant part, that a person committed an offense if he went "into or near any public place, or into or near any private house, and .... rudely display[ed] any pistol or other deadly weapon, in a manner calculated to disturb the inhabitants of such public place or private house[.]" Id. When the Penal Code was modernized in 1974, the relevant portion of the statute was enacted in its current form, making it an offense to display a firearm in public "in a manner calculated to alarm." Tex. Penal Code Ann . § 42.01(a)(8) (West 2018). Given the origin of this statute, it is apparent that the Legislature's use of the word "calculated" in this context was derived from the "Disturbance of the Peace" law that preceded the modern penal code. In view of the relative lack of informative legislative history, and where, as here, there has been a significant recent change in the law, namely the enactment of the open-carry law, that impacts the application of this statute, the most important factor to examine is the consequences of a particular construction.

Two intermediate appellate courts, called upon to interpret the disorderly-conduct statute, have adopted an interpretation of the word "calculated" similar to the one that I have suggested above. See Ex parte Poe , 491 S.W.3d 348, 354 (Tex. App.-Beaumont 2016, pet. ref'd) ; Lovett v. State , 523 S.W.3d 342, 347 (Tex. App.-Fort Worth 2017, pet. ref'd). In both cases, the individuals charged with disorderly conduct asserted that they believed their conduct in openly carrying firearms was lawful and that they harbored no intent to cause public alarm. See Poe, 491 S.W.3d at 352-53 (defendant charged for openly carrying long gun in shopping mall as display of Second Amendment rights); Lovett, 523 S.W.3d at 344-45 (defendant charged for openly carrying antique handgun while filming police officers during a traffic stop). Thus, to the extent it is suggested that the conflict between the open-carry law and the disorderly-conduct statute is merely a theoretical problem and that open-carry rights will not be affected by the Court's holding, these cases suggest otherwise. I further agree with the observation of the court of appeals in Lovett that "[c]ertainly ... the mere presence of a firearm or deadly weapon in public cannot possibly supply the requisite mens rea for a disorderly-conduct conviction, or else anyone participating in Texas's embrace of lawful open carry would be guilty the moment he stepped outside his home visibly armed." Lovett , 523 S.W.3d at 348. Although the Court's opinion agrees with this sentiment in principle, it is difficult to see how its approach, in practice, will not infringe upon the lawful right to openly carry firearms in Texas.

See Colten v. Kentucky, 407 U.S. 104, 108-10, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (upholding Kentucky disorderly-conduct statute over vagueness challenge; where statute required proof of a person's subjective "intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," statute was not impermissibly vague because "citizens who desire to obey the statute will have no difficulty in understanding it") (citations omitted).